FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Dec 08, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| RALPH L.,[1] | No.    1:22-cv-3001-EFS |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S SUMMARY-JUDGMENT MOTION, DENYING DEFENDANT'S SUMMARY-JUDGMENT MOTION, AND REMANDING FOR FURTHER PROCEEDINGS** |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Ralph L. appeals the denial of benefits by the Administrative Law Judge (ALJ). Because the ALJ misconstrued a critical statement in a treating physician's medical opinion and did not discuss probative evidence about lumbar scarring, the ALJ's sequential evaluation was consequentially impacted. This matter is remanded for further proceedings.

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 1

1

## I.      Five-Step Disability Determination

2

A five-step evaluation determines whether a claimant is disabled.[2] Step one

3

assesses whether the claimant is engaged in substantial gainful activity.[3] Step two

4

assesses whether the claimant has a medically severe impairment or combination

5

of impairments that significantly limit the claimant's physical or mental ability to

6

do basic work activities.[4] Step three compares the claimant's impairment or

7

combination of impairments to several recognized by the Commissioner to be so

8

severe as to preclude substantial gainful activity.[5] Step four assesses whether an

9

impairment prevents the claimant from performing work he performed in the past

10

by determining the claimant's residual functional capacity (RFC).[6] Step five

11

assesses whether the claimant can perform other substantial gainful work—work

12

that exists in significant numbers in the national economy—considering the

13

claimant's RFC, age, education, and work experience.[7]

14

15

16

_____

17

[2] 20 C.F.R. § 404.1520(a).

18

[3] *Id.* § 404.1520(a)(4)(i), (b).

19

[4] *Id.* § 404.1520(a)(4)(ii), (c).

20

[5] *Id.* § 404.1520(a)(4)(iii), (d).

21

[6] *Id.* § 404.1520(a)(4)(iv).

22

[7] *Id.* § 404.1520(a)(4)(v), (g).

23

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 2

## II.    Background

Following a car accident, Plaintiff was diagnosed with multilevel degenerative disk and facet change with most significant findings at L5-S1 and with a mild mass on the descending right S1 nerve root, along with foraminal stenosis at L5-S1, which was suspected to be irritating or impinging the left L5 nerve root.[8] Plaintiff underwent lumbar surgery in 2011.[9]

Thereafter, Plaintiff continued to suffer from lumbar back pain and later cervical neck pain. Plaintiff sought treatment for his back and neck pain from Dr. Alyssa Stickney, who managed his opioid medication and oversaw his other treatment, including physical therapy, injections, and ultimately another lumbar surgery to address Plaintiff's degenerative disk disease in September 2020.[10] Although it was suspected that Plaintiff also had pseudomeningocele (a collection of fluid in the spinal cord), no pseudomeningocele was observed during the September 2020 surgery. Instead, extreme scarring from the prior surgery was found, requiring the surgeon to perform a complex revision decompression of the L5-S1, which took "50 percent longer than usual."[11] In addition to the L5-S1 decompression surgery, the following were performed: microscopically-aided L2-3

---

[8] AR 639.

[9] AR 423.

[10] *See e.g.*, AR 482–564, 575–765.

[11] AR 955.

bilateral partial facetectomies, foraminotomies, and left-sided discectomy; full neurolysis at L5 and S1 bilaterally; posterior 3-column osteotomy at L5-S1 for deformity correction; posterior bilateral interbody fusions at L5-S1 with cages and local bone graft; posterolateral nonsegmental instrumentation and fusion at L5-S1 with a rod system with local bone graft; and microscopic dissection for neural decompression.

The surgery relieved Plaintiff's lumbar pain significantly. However, Plaintiff continued to have significant neck pain. Imaging indicated that Plaintiff had degenerative changes at C3–C4 and C4-C5, moderate central canal narrowing and moderate left foraminal narrowing at C3-C4, C2–C5 neck dysplasia, and hyperlordosis of C4.[12]

Plaintiff filed a Title 2 application alleging disability beginning March 22, 2011.[13] After the agency denied his application initially and on reconsideration, Plaintiff requested a hearing before an ALJ.[14] ALJ Cynthia Hale held a telephonic hearing in February 2021, during which Plaintiff and a vocational expert

---

[12] AR 425–27, 1003.

[13] AR 25, 184–87. In 2013, Plaintiff filed a prior disability application; that application was denied. AR 61–78. Plaintiff was not represented by counsel during that disability-application process. AR 64.

[14] AR 112–14, 120–28.

testified.[15] Plaintiff testified that his low-back conditions and later his cervical conditions caused him significant pain that restricted his activities of daily living. For instance, Plaintiff testified that he was limited during the relevant period of April 9, 2016, to December 31, 2016, as to doing laundry and dishes and sitting more than 15–20 minutes.[16] Plaintiff reported that he had back pain when changing positions, it took him longer to get dressed, and he needed to lean on something when he went to the grocery store.[17] Plaintiff testified that after his September 2020 lumbar surgery, his low-back pain and his ability to perform household chores greatly improved but that he still had pain and limitations, largely due to his cervical impairments.[18]

The ALJ denied Plaintiff's application.[19] In conducting the sequential disability evaluation, the ALJ found:

- Step one: Plaintiff had not engaged in substantial gainful activity since April 9, 2016, the date of the prior ALJ's disability denial, through Plaintiff's date of last insured, December 31, 2016.

---

[15] AR 38–60.

[16] AR 46–50.

[17] AR 48–50.

[18] AR 51–52.

[19] AR 22–37.

- Step two: Plaintiff had the following medically determinable severe impairment: degenerative disc disease, status post laminectomy.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the ability to perform light work with standing and walking limited to 4 hours in an 8-hour workday so long as Plaintiff could change positions at least once per hour, with the additional limitations:

  > occasional climbing ramps and stairs; no climbing ladders, ropes, or scaffolding; frequent balancing; occasional stooping, kneeling, crouching, and crawling; avoidance of concentrated exposure to extreme cold, excessive vibration, and workplace hazards such as dangerous machinery; and avoidance of concentrated exposure to working at unprotected heights.

- Step four: Plaintiff was unable to perform past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as laundry aide, assembler of small products, and office helper.

In reaching her decision, the ALJ found the treating opinions of Dr. Stickney, who opined disabling limitations, unpersuasive and the reviewing opinion of Dr. Charles Wolfe, who opined that Plaintiff could perform light work

consistent with the RFC, partially persuasive.[20] The ALJ also found Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record."[21] The ALJ did not mention the report prepared by Plaintiff's wife concerning Plaintiff's symptoms and limitations.[22]

Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied review.[23] Plaintiff timely appealed to the Court.

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[24] The Commissioner's decision is set aside "only if it is not supported by substantial

---

[20] AR 30–31. The ALJ listed Dr. Guillermo Rubio's reviewing opinion, which was like Dr. Wolfe's opinion; however, the ALJ did not identify what weight she gave Dr. Rubio's opinion. That error is harmless, as the ALJ's reasoning for finding Dr. Wolfe's opinion persuasive applies as well to Dr. Rubio's similar opinion.

[21] AR 31.

[22] AR 230–37.

[23] AR 1–7.

[24] 42 U.S.C. § 405(g).

evidence or is based on legal error."[25] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[26] Moreover, because it is the role of the ALJ—and not the Court—to weigh conflicting evidence, the Court upholds the ALJ's findings "if they are supported by inferences reasonably drawn from the record."[27] The Court considers the entire record.[28]

Further, the Court may not reverse an ALJ decision due to a harmless error.[29] An error is harmless "where it is inconsequential to the ultimate nondisability determination."[30]

---

[25] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

[26] *Id.* at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[27] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[28] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up).

[29] *Molina*, 674 F.3d at 1111.

[30] *Id.* at 1115 (cleaned up).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# IV.    Analysis

## A.    Lumbar Scarring: Plaintiff did not waive his argument that the ALJ failed to consider his lumbar scarring.

During his 2020 lumbar surgery, extreme scarring was found—and addressed—at L5-S1.[31] The ALJ did not mention this extreme scarring in her decision and therefore did not discuss whether the scarring contributed to Plaintiff's reported pain. Plaintiff argues that this error impacted the ALJ's overall interpretation of the medical evidence and opinions and Plaintiff's symptom reports about his back pain. The Commissioner argues that the ALJ's failure to consider the L5-S1 scarring results from Plaintiff counsel's failure to bring such to the ALJ's attention during the administrative process and therefore Plaintiff waived relying on the scarring as a basis to explain his pain.[32]

While it would have been a best practice for Plaintiff's counsel to have highlighted the extreme scarring found at L5-S1, this failure did not waive Plaintiff's ability to rely on this probative evidence. This is because Plaintiff and his counsel consistently maintained that Plaintiff's back conditions caused pain and limited him. Counsel obtained and submitted medical records, including imaging, treatment notes, physical therapy notes, and the 2020 lumbar surgery notes, and Plaintiff testified about his lumbar pain. The medical records reflect

---

[31] AR 850, 955.

[32] ECF No. 15.

1   that Plaintiff reported back pain to his care providers, but the exact conditions

2   contributing to his pain was a question that medical providers continued to work

3   toward answering. Based on imaging, it was suspected by ARNP Tanya Nguyen

4   and Dr. Jens Chapman at Swedish Neuroscience Specialists that Plaintiff had

5   pseudomeningocele, along with other lumbar conditions seen by imaging.[33]

6   However, during surgery no pseudomeningocele was observed; instead, extreme

7   scarring at L5-S1 was found at the site of previous decompression surgery.[34] This

8   extreme scarring doubled the amount of surgical time for the L5-S1 dissection.[35] As

9   noted by Dr. Chapman, it can take a lengthy amount of time for nerves to recover

10  following surgery, and as mentioned in the medical articles cited by Plaintiff,

11  lumbar scarring can cause significant pain.[36] Therefore, that Plaintiff's lumbar

12  pain was not significant immediately following his 2011 surgery but increased over

13  time, may be attributable, at least in part, to the scarring.

14      Although an ALJ is not required to discuss every bit of evidence in the

15  record,[37] the extreme scarring at L5-S1 constitutes significant probative evidence.

16  "[I]t is incumbent upon the ALJ to scrupulously and conscientiously probe into,

---

[33] AR 816.

[34] AR 850, 955.

[35] AR 850, 955.

[36] AR 958; ECF No. 13 at 4 (citing medical articles discussing scar-tissue pain).

[37] *Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

inquire of, and explore for all the relevant facts."[38] Based on this medical record, which documents several lumbar conditions likely contributing to his back pain, Plaintiff and counsel did not waive arguing that the scarring, instead of the previously suspected pseudomeningocele, contributed to his back pain. As is discussed more below, the ALJ therefore erred when she discounted Dr. Stickney's medical opinions and Plaintiff's pain reports without discussing why such were not supported by the extreme scarring (along with the other back conditions). Moreover, because numerous lumbar conditions were confirmed during the 2020 surgery, that there was no sign of the suspected pseudomeningocele is not a basis to discount Dr. Stickney's opinion nor Plaintiff's symptom complaints.

**B.     Medical Opinions: The ALJ must reconsider Dr. Stickney's opinions.**

1.     <u>Dr. Stickney clarified her opinions</u>

Dr. Stickney treated Plaintiff for his longstanding back pain and other conditions. Dr. Stickney issued medical opinions in 2020 and 2021, and later clarified her 2020 opinion. The ALJ was required to consider and evaluate the persuasiveness of the medical opinions.[39] The factors for evaluating the persuasiveness of medical opinions include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[40] Supportability

---

[38] *Garcia v. Comm'r of Social Sec.*, 768 F.3d 925, 930 (9th Cir. 2014) (cleaned up).

[39] 20 C.F.R. § 404.1520c(a), (b).

[40] *Id.* § 404.1520c(c)(1)–(5).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

and consistency are the most important factors, and the ALJ is required to explain how both factors were considered.[41]

In March 2020, Dr. Stickney completed a medical source statement and answered questions submitted by Plaintiff's counsel, including:[42]

> 1. Do the recent medical diagnoses of cervical and lumbar degenerative disk disease, cervical stenosis with myelopathy, and lumbar radiculopathy, represent medical conditions which have existed since April 9, 2016 and prior to Mr. Lumpkin's date last insured of December 31, 2016?
>
> YES _____        NO __X_____
>
> Please provide an explanation for your answer.
>
> No imaging of cervical spine prior to 2016 to support that these existed

Dr. Stickney also stated that Plaintiff "has long had severe limitations in his function. His cervical disease has worsened but he's had severe and long-standing limitations to his functioning. He's long been using opioid medication to accomplish the minimum of daily AOLs (activities of daily living)."[43] Dr. Stickney recommended that Plaintiff be limited to standing/walking for 30 minutes, sitting for 30 minutes, and lifting/carrying 5 pounds if lifting/carrying for a considerable portion of the workday; would need to frequently change positions and lie down 2–3

---

[41] *Id.* § 404.1520c(b)(2).

[42] AR 767.

[43] AR 768. *See also* AR 770.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 12

times during the workday; could occasionally climb stairs, reach, and finger; could frequently handle and feel; should not push/pull, twist, stoop, crouch, or climb stairs; would be absent from work more than 3 times per month; and would be significantly limited in his ability to concentrate, maintain attention, and handle stress due to his lumbar and cervical pain.[44]

After Plaintiff's lumbar surgery in the fall of 2020, Dr. Stickney revised some of the previously opined limitations.[45] Dr. Stickney opined that Plaintiff should be limited to lifting 5 pounds if lifting for a considerable portion of the day, could stand/walk 1 hour and sit 1 hour a day; should regularly rotate positions and lie down 1–2 times during the workday; could occasionally stoop, crouch, reach, and finger; could occasionally-to-frequently climb stairs and frequently hand and feel; could not twist, push/pull, or climb ladders; would be absent 2–3 times a month; and would be significantly limited in his ability to concentrate, maintain attention, and handle stress due to his cervical pain.

After the ALJ's decision, Dr. Stickney clarified her March 2020 opinion.[46] Dr. Stickney explained that Plaintiff's lumbar degenerative disc disease existed

---

[44] AR 770–78.

[45] AR 1044–53.

[46] The Appeals Council considered Dr. Stickney's clarification to her 2020 opinion. AR 2. "[W]hen the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative

1

2

before April 2016, as it was present on the May 2013 MRI, and that his degenerative disc disease had gradually worsened over time.[47]

3

    2.   <u>The ALJ erred when evaluating Dr. Stickney's opinions.</u>

4

When summarizing Dr. Stickney's 2020 opinion, the ALJ stated Dr. Stickney

5

opined "that the claimant's recent diagnosis of cervical and lumbar degenerative

6

disc disease, cervical stenosis with myelopathy, and lumbar radiculopathy, did not

7

represent medical conditions that existed from April 9, 2016 through December 31,

8

2016."[48] The ALJ found the opinion persuasive, finding that it was supported by

9

"the lack of any such diagnosis during the relevant period."[49] However, the ALJ

10

misunderstood Dr. Stickney's opinion: Dr. Stickney was not opining that Plaintiff

11

had *none* of these conditions but rather that there was no imaging to support a

12

finding that Plaintiff had *cervical* conditions, as compared to lumbar conditions,

13

during that period. This was explained by Dr. Stickney in her comments following

14

her checkmark "no" answer to counsel's question (copied above) and as later

15

clarified by Dr. Stickney. Based on imaging from 2013, Dr. Stickney opined that

16

17

18

record, which the district court must consider when reviewing the Commissioner's

19

final decision for substantial evidence." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012).

20

[47] AR 11–14.

21

[48] AR 31.

22

[49] AR 31.

23

Plaintiff suffered from lumbar degenerative disk disease between April 9, 2016, and December 31, 2016.[50] In comparison, Dr. Stickney acknowledged there was no imaging prior to 2016 to support a medical diagnosis of cervical degenerative disk disease and cervical stenosis with myelopathy between April 9, 2016, and December 31, 2016.[51]

---

[50] AR 13. Dr. Stickney relies on a May 24, 2013 MRI. The May 24, 2013 MRI is used as a reference point for later MRIs. For instance, the 2019 MRI results were compared to the May 2013 MRI and the reviewing doctor noted, "Prominent degenerative endplate signal changes at L5-S1 are *again noted*"; "Stable mild anterior compression deformities at L1 and L2 associated with disc degermation and chronic Schmorl's notes. Degenerative nodes and endplate irregularity is also noted at L5-S1 especially anteriorly, *similar findings were present previously* but now may be progressive"; "*Similar findings* of moderately prominent degenerative disk disease" at L1-L2; and "Moderate to severe bilateral foraminal stenosis *persists* from intraforminal extension of the broad-based degenerative disk osteophyte complex, exacerbated by facet arthropathy and mild L5 on S1 retrolisthesis." AR 628 (emphasis added). *See also* AR 626, 371–72 (imaging from 2018 noting progression of degenerative disk disease at L1-L2, L2-L3, and L5-S1, along with marked degenerative face disease at L5-S1).

[51] AR 767, 13.

Based on the 2013 imaging, the ALJ's finding that the record lacks medical support for a diagnosis of lumbar degenerative disc disease during the relevant period is clearly erroneous and is inconsistent with the ALJ's step-two finding. As a result of the ALJ's oversight of the May 2013 MRI, the ALJ did not appreciate that Dr. Stickney believed that Plaintiff's lumbar conditions impacted his functioning well before the date of last insured until his lumbar surgery in September 2020. Therefore, the ALJ's analysis as to whether Dr. Stickney's opinions were supported by and consistent with the record was consequently impacted. The ALJ must reconsider Dr. Stickney's opinions on remand. On remand, the ALJ must consider whether the opined limitations are consistent with or supported by the lumbar conditions on the May 2013 MRI (and the anticipated progression of such through the date of last insured based on later MRI imaging) and the L5-S1 scarring.

**C.    Symptom Reports: The ALJ must reconsider on remand.**

Plaintiff reported that, during the relevant period of April through December 2016, he experienced significantly limiting back pain. This back pain limited his ability to do laundry, wash dishes, change positions, grocery shop, sit, and walk.[52] Plaintiff testified that after his September 2020 lumbar surgery, his lumbar pain and his ability to perform household chores greatly improved but he still had pain and limitations due to his cervical impairments.[53]

---

[52] AR 46–50.

[53] AR 51–52.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his medically determinable impairments "not entirely consistent with the medical evidence and other evidence in the record."[54] The ALJ also mentioned that Plaintiff's "limitations are accommodated by the residual functional capacity, which is consistent with the objective findings, the noted opinion evidence, and the claimant's documented activities."[55]

While Plaintiff does not dispute that it was appropriate for the ALJ to consider the objective medical evidence, improvement with treatment, and Plaintiff's activities, Plaintiff argues that the ALJ's offered reasons are not "specific, clear and convincing" reasons supported by substantial evidence to reject Plaintiff's symptom reports.[56]

---

[54] AR 31.

[55] AR 31.

[56] *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036). *See also* 20 C.F.R. § 404.1529(c) (identifying factors to consider); *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 599–600 (9th Cir. 1999) (considering evidence of improvement); *Molina*, 674 F.3d at 1113 (considering whether claimant engages in activities that involve abilities equivalent to those required to work); 3 Soc. Sec. Law & Prac. § 36:26, Consideration of objective medical evidence (2019).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 17

The following summary was the ALJ's entire analysis as to Plaintiff's

symptom claims:

> Even prior to the relevant period, in October of 2014, the claimant
> registered a muscle spasm on the lumbar area but his sensation was
> normal, as were his reflexes and lower extremity strength. In August
> of 2015, the claimant exhibited full range of motion in his lumbar
> spine. In April of 2016, the claimant reported he was doing well and
> his medications assisted him with his ability to get his housework
> done and sleep. The claimant complained of low back, neck, and pain
> under the shoulder blades on August 31, 2016 but also stipulated that
> his pain was controlled with medication.[57]

1.  <u>The ALJ failed to meaningfully explain why Plaintiff's symptom
    reports were not consistent with the objective medical evidence.</u>

Notwithstanding the normal findings highlighted by the ALJ, Plaintiff

consistently reported pain that—though slightly lessened by medication—was

nonetheless observed at appointments between his initial lumbar surgery in 2011

and December 2016, along with tenderness over his low back, decreased back

extension, decreased sensation in his right thigh, and with a muscle spasm.[58] In

addition to these objective findings during appointment sessions, the imaging from

May 2013 revealed degenerative disc disease of the lumbar, which worsened as was

---

[57] AR 30 (citing AR 349, 345, 337–38, 334–35).

[58] Plaintiff's reports of activity-altering pain, notwithstanding pain medication,

after his initial surgery began about February 27, 2013. *Compare* AR 725, 737,

*with* AR 482, 485, 488, 491, 497, 351, 506, 509, 512.

indicated by the 2018 and 2019 lumbar MRIs.[59] The 2018 MRI revealed—in addition to stable mild kyphosis at L1, stable 5 mm degenerative retrolisthesis at L2-L3, stable 6 mm degenerative retrolisthesis at L5-S1, and stable old mild wedging at L1 and L2 with irregular endplates—increased narrowing at L1-L2 to now moderate to marked with increased subcortical sclerosis, increased narrowing at L2-L3 with increased subcortical sclerosis, increased narrowing at L5-S1 to marked with stable moderate subcortical sclerosis, marked degenerative facet disease at L5-S1, and mild degenerative changes in the right sacroiliac joint.[60] And as found during the May 2020 surgery, Plaintiff developed extreme scar tissue at L5-S1 after the 2011 surgery. The ALJ failed to discuss the imaging and whether Plaintiff's reported pain was consistent with or supported by the imaging—or the observed tenderness and decreased range of motion at some of the medical appointments. The ALJ must more meaningfully explain why Plaintiff's reported pain is neither consistent with nor unsupported by the objective medical evidence.

2. <u>The ALJ failed to meaningfully explain why the medical record indicates that Plaintiff's pain and limitations so improved with treatment that his improvement was inconsistent with his reported symptoms.</u>

---

[59] AR 372–73, 362–63, 628–29.

[60] AR 372–73.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

As the ALJ highlighted, Plaintiff reported that medication helped his pain and Dr. Stickney often noted that Plaintiff's pain was controlled by medication.[61] But the ALJ's brief analysis does not clearly indicate that she considered the "improvement" evidence in its full context.[62] For instance, while Plaintiff reported at his April 2016 medical appointment that he was doing well, four months later during his August 2016 appointment, Plaintiff reported pain of 6/10 with medication and 8/10 without medication and that his pain impacted his activities of daily living at 5/10 with medication and 7/10 without medication.[63] Thus, even with medication, Plaintiff's pain was significant and impacted his activities of daily

---

[61] AR 30 (citing AR 337–38, 334–35).

[62] Context is crucial when interpreting medical records as "treatment records must be viewed in light of the overall diagnostic record." *Ghanim*, 763 F.3d at 1164. *See Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (requiring the ALJ to carefully consider "indications in the medical record that [the claimant] was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity") (quoting *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001)).

[63] AR 519–524.

living.[64] The ALJ failed to clearly and convincingly explain why Plaintiff's noted improvement was inconsistent with his reports of pain and limitations.

On remand, when reconsidering whether Plaintiff's improvement with medication is inconsistent with his reported pain and limitations, the ALJ must be mindful that prescription practices to treat chronic pain include evaluating whether the benefits of the continued opioid therapy outweigh the harms of continued therapy.[65] Therefore, Dr. Stickney's comments that Plaintiff's "chronic pain issues are being controlled by the current treatment regimen" may need to be interpreted within this context.[66] To aid in evaluating this medical evidence, the ALJ should consider submitting interrogatories to Dr. Stickney to explain her statements that Plaintiff's chronic pain was being controlled by the treatment regimen and/or elicit testimony about pain-medication practices from a medical-expert.[67]

---

[64] *See* ECF No. 16 at 4 (https://specialistshospitalshreveport.com/patient-resources/using-the-pain-scale/) (last visited Sept. 6, 2022).

[65] https://www.cdc.gov/opioids/providers/prescribing/guideline.html (last visited Sept. 6, 2022).

[66] *See, e.g.*, AR 335, 352, 503.

[67] *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (cleaned up) ("The ALJ always has a special duty to fully and fairly develop the record" in order to make a fair determination as to disability, even where, as here, "the claimant is

1

2

3.   <u>The ALJ failed to clearly and convincingly explain why Plaintiff's ability to perform housework was inconsistent with his reported symptoms.</u>

3

4   The ALJ generally stated that the RFC was consistent with Plaintiff's

documented activities and mentioned that Plaintiff reported in April 2016 that he

5

was able to get his housework done. These general findings are insufficient to serve

6

as a clear and convincing basis to discount Plaintiffs' reported pain and limitations,

7

particularly as Plaintiff testified that he performed housework at a slow pace.[68]

8   **D.   Remand for further proceedings.**

9   The ALJ failed to fully consider Plaintiff's lumbar conditions when

10   evaluating the medical opinions and Plaintiff's symptom reports. The ALJ's errors

11

12

13   represented by counsel."); Hearing, Appeals, and Litigation Law Manual

14   (HALLEX) I-2-5-18 (Obtaining Testimony from a Claimant's Medical Source);

15   HALLEX I-2-5-32 (Medical Experts—General).

16   [68] *Smolen v. Chater*, 80 F.3d 1273, 1287 n.7 (9th Cir. 1996) (recognizing that "many

17   home activities may not be easily transferable to a work environment where it

18   might be impossible to rest periodically or take medication"); *Vertigan v. Halter*,

19   260 F.3d 1044, 1050 (9th Cir. 2001) (emphasizing that simply because a claimant

20   can carry on certain daily activities does not detract from his credibility as to his

21   overall disability if the activities do not consume a substantial part of the day and

22   do not reflect the ability to sustain fulltime work).

23

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 22

require remand for a new sequential evaluation as it is unclear whether Plaintiff's conditions during the at-issue period preclude him from sustaining work.[69]

On remand, the ALJ is encouraged to obtain clarifying information from Dr. Stickney and/or obtain medical-expert testimony about prescription-issuance practices to understand the treatment-note statements that Plaintiff's "chronic pain issues are being controlled by the current treatment regimen"[70] and whether Plaintiff's conditions could elicit the type of pain reported. The ALJ is to then reconsider the medical evidence, medical opinions, and Plaintiff's symptom reports and perform the sequential disability evaluation anew.

## V.    Conclusion

Plaintiff establishes the ALJ erred. The ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—the sequential process.

Accordingly, **IT IS HEREBY ORDERED**:

1.    Plaintiff's Motion for Summary Judgment, **ECF No. 13**, is **GRANTED**.

2.    The Commissioner's Motion for Summary Judgment, **ECF No. 15**, is **DENIED**.

---

[69] *See Leon v. Berryhill*, 800 F.3d 1041, 1045 (9th Cir. 2017); *Garrison*, 759 F.3d at 1020.

[70] *See, e.g.*, AR 335, 352, 503.

3.      The Clerk's Office shall enter **JUDGMENT** in favor of Plaintiff

REVERSING and REMANDING the matter to the Commissioner of

Social Security for further proceedings pursuant to sentence four of 42

U.S.C. § 405(g).

4.      The case shall be **CLOSED**.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and

provide copies to all counsel.

DATED this 8th  day of December 2022.


                        s/Edward F. Shea
                        EDWARD F. SHEA
                 Senior United States District Judge